[Civ. No. 40447. First Dist., Div. Three. Nov. 15, 1977.]

GEOTHERMAL KINETICS, INC., Plaintiff and Respondent, v. UNION OIL COMPANY OF CALIFORNIA et al., Defendants and Appellants.

**COUNSEL**

Brobeck, Phleger & Harrison, Robert S. Daggett and David J. Wynne for Defendants and Appellants.

Steinhart, Goldberg, Feigenbaum & Ladar, Marvin D. Morgenstein, David J. Romanski, Fitzgerald & von der Mehden and John D. Fitzgerald for Plaintiff and Respondent.

Evelle J. Younger, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Dennis M. Eagan, Deputy Attorney General, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**SCOTT, Acting P. J.**—The issue presented here is whether geothermal resources belong to the owner of the mineral estate or the owner of the surface estate. We conclude that the general grant of minerals in, on or under the property includes a grant of geothermal resources, including steam therefrom.

The owners of the surface estate, Union Oil Company of California, Magma Power Company, Thermal Power Company, and George and Hazel Curry, appeal from a judgment quieting title to the geothermal steam and power and geothermal resources in Geothermal Kinetics, Inc., the owner of the mineral estate. The subject of this action is a geothermal resource existing beneath the surface of approximately 408 acres of property located in an area of Sonoma County known as "The Geysers."

Geothermal Kinetics derives its title from a 1951 deed wherein the owners of the property conveyed to Geothermal Kinetics' predecessor in interest "all minerals in, on or under" the property. George and Hazel Curry succeeded to the surface estate and in 1963 leased to Magma and Thermal (who subsequently assigned a portion of their lease to Union Oil) the right to "drill for, produce, extract, remove and sell steam and steam power and extractable minerals from, and utilize, process, convert and otherwise treat such steam and steam power upon, said land, and to extract any extractable minerals."[1] At the time of execution of the lease, the Currys, the surface fee holders, apparently believed they owned the mineral rights. Geothermal Kinetics, however, has the only valid mineral lease. Therefore, appellants rely solely on their interest in the surface estate for the right to the geothermal resources. In 1973, Geothermal Kinetics, as holder of the leasehold of the mineral estate, drilled a geothermal well on the property at a cost of approximately $400,000.

I. Appellants' primary contention is that geothermal energy is not a mineral; they argue that the resource is not steam, rocks or the underground reservoir but the heat transported to the surface by means of steam. A mineral, appellants claim, must have physical substance and heat is merely a property of a physical substance. In support of this

[1]There is no contention here that appellants derived their title from the United States government; therefore, the holding of *United States* v. *Union Oil Co. of California* (9th Cir. 1977) 549 F.2d 1271, cert. den., 434 U.S. 930 [54 L.Ed.2d 291, 98 S.Ct. 418], wherein the United States government was deemed to retain the right to geothermal resources by virtue of its reserving mineral rights to the patented property, is not dispositive of the present appeal.

contention, appellants cite several definitions of "mineral" containing reference to "substance." Appellants then reason that because they own everything in the property except for "mineral" substances, they own the geothermal resources, citing Civil Code section 829 which provides: "The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it."

Respondent contends that since the parties did not specify particular minerals that were intended to be within the scope of the grant nor include any limitations on it, the grant conveyed the broadest possible estate. It urges that the "grant is to be interpreted in favor of the grantee." (Civ. Code, § 1069.) Respondent urges that we not adopt a mechanistic approach based upon textbook definitions of the term mineral; instead we should adopt a "functional" approach which focuses upon the purposes and expectations generally attendant to mineral estates and surface estates. Since normally the owner of the mineral estate seeks to extract valuable resources from the earth, whereas the surface owner generally desires to utilize land and such resources as are necessary for his enjoyment of the land, the geothermal resources should follow the mineral estate. We agree with respondent's contention.

II. Geothermal resources have been used commercially for several centuries, including their use to generate electricity in the early 1900s. In the United States, exploration and utilization of such resources has occurred generally in the western part of the nation, particularly in California. Commercial development of The Geysers area near Santa Rosa began in 1955 with the successful drilling of four wells. In 1960, Pacific Gas & Electric Company opened an electrical generating plant at The Geysers using the geothermal steam to power the generating turbines. Geothermal steam from respondent's well is piped to the P. G. & E. plant located about a mile away.

Geothermal energy is a naturally occurring phenomenon whose origin is the heat of the interior of the earth. The geothermal resources of The Geysers is apparently due to a layer of molten or semi-molten rock, called "magma," which has risen from the interior of the earth to a depth of 20,000 to 30,000 feet. Above this mass of magma, which constitutes the basic heat source for the area, are protuberances of magma called "plugs" or "stocks," which may rise within 10,000 to 15,000 feet of the surface of the earth. This intrusion of hot magma expels gases and liquids which combine with ancient water trapped in the surrounding sediment to form a geothermal fluid or brine. This fluid converts to

steam which circulates in a sedimentary formation and transports mineral and heat from the magma toward the surface. Convection currents cause water to rise and cool, forming a mineral shell of silica and calcium carbonate which seals off the magma intrusion from the surface. This shell is approximately 1,000 feet thick in the area of respondent's well. Immediately below this silicacarbonate seal is circulating geothermal steam and other gases; below these gases is boiling brine.

The seal over the steam reservoir permits only a small amount of ground water to penetrate. The amount of this ground water is insignificant compared to the volume of geothermal steam and brine; its penetration of the seal does not serve to materially deplete the general supply of ground water available for surface use. Hence, the ground water system and the geothermal steam reservoir are separate and distinct. Some geothermal steam escapes from the reservoir to the earth's surface through cracks in the silicacarbonate seal.

At The Geysers wells drilled through the silicacarbonate seal bring geothermal steam to the surface. Respondent's well is approximately 7,200 feet deep. The extracted hot steam, which contains minerals, powers steam turbines to produce commercially valuable electric power. The minerals in the condensed steam are generally toxic, requiring the reinjection of this water back below the silicacarbonate seal. Purification of the condensed steam so as to render it safe for agricultural or domestic purposes is not economically feasible. Geothermal resources are not necessary or useful to surface owners, other than as a source of electricity. The utilization of geothermal resources does not substantially destroy the surface of the land. The production of the energy from geothermal energy is analogous to the production of energy from such other minerals as coal, oil and natural gas in that substances containing or capable of producing heat are removed from beneath the earth. In fact, the wells used for the extraction of the steam are similar to oil and gas wells.

III. ■ In the construction of a grant or reservation of an interest in real property, a court seeks to determine the intent of the parties, giving effect to a particular intent over a general intent. (Civ. Code, §§ 1066, 1636; Code Civ. Proc., § 1859.) In the present case, the 1951 grant of mineral rights makes no specific mention of geothermal resources; hence, the general intent of the parties must be ascertained. In the absence of an expressed specific intent, several courts have sought to determine the general intent of the parties in construing the word

"mineral" in a deed, rather than resort to attempts at rigid definition. (See *United States* v. *Union Oil Co. of California* (9th Cir. 1977) 549 F.2d 1271, 1274, fn. 7; *Northern Natural Gas Company* v. *Grounds* (10th Cir. 1971) 441 F.2d 704, 714, cert. den. (1971) 404 U.S. 951 [30 L.Ed.2d 267, 92 S.Ct. 268]; *Acker* v. *Guinn* (Tex. 1971) 464 S.W.2d 348, 352.)

■ Initially, we observe that "as a general rule a grant or reservation of all minerals includes all minerals found on the premises whether or not known to exist." (*Renshaw* v. *Happy Valley Water Co.* (1952) 114 Cal.App.2d 521, 526 [250 P.2d 612].) Thus, the fact that the presence of geothermal resources may not have been known to one or both parties to the 1951 conveyance is of no consequence.

■ Generally, the parties to a conveyance of a mineral estate expect that the enjoyment of this interest will not involve destruction of the surface. (See *Bambauer* v. *Menjoulet* (1963) 214 Cal.App.2d 871, 872-873 [29 Cal.Rptr. 874, 95 A.L.R.2d 839]; but see *Yuba Inv. Co.* v. *Yuba Consol. Gold Fields* (1920) 184 Cal. 469 [194 P. 19]; *Trklja* v. *Keys* (1942) 49 Cal.App.2d 211, 212 [121 P.2d 54].) In *Acker* v. *Guinn* (Tex. 1971) 464 S.W.2d 348, the deed of "oil, gas and other minerals in and under" the property did not convey an interest in the iron ore. The court observed that the parties to a mineral lease or deed usually think of the mineral estate as including valuable substances that are removed from the ground by means of wells or mine shafts, but "a grant . ... of 'minerals' . . . should not be construed to include a substance that must be removed by methods that will, in effect, consume or deplete the surface estate." (At p. 352.)

Here, the trial court found that the exploitation of geothermal resources does not substantially destroy the surface of the property. Wells for the extraction of the energy of geothermal steam are similar to those wells used in drilling for oil. Appellant Union Oil Company apparently considered the development of geothermal resources to be a natural extension of their oil and gas drilling operations. The court found that the production of energy from geothermal resources is analogous to the production of energy from such other mineral resources as coal, oil and natural gas in that materials containing energy are extracted from the earth and transported to facilities where this energy is transformed into electrical energy.[2] The fact that extracted coal, oil and natural gas

[2] The first California legislation, in 1965, enacting a statutory scheme for the regulation of geothermal resources was made a part of Division Three of the Public Resources Code (§ 3700 et seq.), which is entitled "Oil and Gas." The Geothermal Resources Act of

contain chemical energy while geothermal resources contain thermal energy is not significant; uranium ore is not denied the status of a mineral because it contains nuclear energy instead of chemical energy.

The parties to the 1951 grant had a general intention to convey those commercially valuable, underground, physical resources of the property. They expected that the enjoyment of this interest would not destroy the surface estate and would involve resources distinct from the surface soil. In the absence of any expressed specific intent to the contrary, the scope of the mineral estate, as indicated by the parties' general intentions and expectations, includes the geothermal resources underlying the property.

In *United States* v. *Union Oil Co. of California, supra,* 549 F.2d 1271, the court, dealing with other property in The Geysers area, interprets mineral reservations of "all the coal and other minerals" in patents issued under the Stock-Raising Homestead Act of 1916 to include geothermal resources underneath the patented land (at p. 1273). Although the basis for the holding is partly the Congressional intent to retain government control over energy resources, the court stated that "the words of the mineral reservation in the Stock-Raising Homestead Act clearly are capable of bearing a meaning that encompasses geothermal resources" (at p. 1274). The court further noted that "all of the elements of a geothermal system—magma, porous rock strata, even water itself—may be classified as 'minerals' " (at p. 1273). Also, in *Reich* v. *Commissioner of Internal Revenue* (1969) 52 T.Ct. 700, affd. (9th Cir. 1972) 454 F.2d 1157, wherein the tax court concluded that the geothermal steam at The Geysers was a gas for purposes of the oil and gas depletion allowance in the Internal Revenue Code, the court rejected the contention that heat, not gas, was being produced at The Geysers.

The cases cited by appellants involving the ownership of geologic formations, are readily distinguishable. *Emeny* v. *United States* (1969) 412 F.2d 1319 [188 Ct.Cl. 1024] holds that the owner of oil and gas leases did not have a right to use an underground geologic structure on the leased property to store helium gas produced elsewhere; the case deals only with the ownership of a geologic formation having value as a storage facility, and not an extractable commercially valuable resource. Contrary to appellants' suggestion, *Edwards* v. *Sims* (1929) 232 Ky. 791

---

1967, relating to the leasing of public lands for the extraction of geothermal resources, is also located in the Public Resources Code in division six dealing with "Oil and Gas and Mineral Leases." It can be inferred from the placement of these statutes that the Legislature viewed geothermal resources as a mineral.

[24 S.W.2d 619] is silent as to the ownership of underground geologic structures where the mineral and surface estates are severed. *Edwards* states that the owner of property is entitled to the free and unfettered control of his land above, upon and below the surface "unless there has been a division of the estate" (at p. 620).

Several courts have held that the grant or reservation of a mineral estate does not include rights to surface or subsurface water. (See *Fleming Foundation* v. *Texaco* (Tex.Civ.App. 1960) 337 S.W.2d 846; *Mack Oil Company* v. *Laurence* (Okla. 1964) 389 P.2d 955.) However, such cases concern water that is part of the normal ground water system. As the trial court found, the water and steam components of geothermal resources are part of a separate water system cut off from these surface and subsurface waters by a thick mineral cap. Only insignificant amounts of ground water enter the geothermal water system. Unlike the surface and subsurface waters, the origin of geothermal water is not rainfall, but water present at the time of the formation of the geologic structure. Because rainfall does not replenish geothermal water, it is a depletable deposit. (See *Reich* v. *Commissioner of Internal Revenue* (1969) 52 T.Ct. 700, affd. (9th Cir. 1972) 454 F.2d 1157.)

Not only is there a sound geologic basis for distinguishing between the usual ground water system and geothermal waters, but the rationale for recognizing the rights of the surface estate to these ground waters is largely inapplicable to geothermal waters. (See Bjorge, *The Development of Geothermal Resources and the 1970 Geothermal Steam Act—Law in Search of Definition* (1974) 46 Colo. L.Rev. 1, 22-23; *United States* v. *Union Oil Co. of California, supra,* 549 F.2d at p. 1280, fn. 21; Olpin, *The Law of Geothermal Resources* (1968) 14 Rocky Mt. Min. L.Inst. 123, 140-141.) Several of the cases cited by appellants in support of the proposition that the surface estate includes rights to surface and subsurface waters, refer to the necessity of this water for the enjoyment of the surface estate. (See *Mack Oil Company* v. *Laurence, supra,* 389 P.2d at p. 961; *Vogel* v. *Cobb* (1943) 193 Okla. 64 [141 P.2d 276, 280, 148 A.L.R. 774].) In the present case, the extraction of geothermal water for a domestic water source is impractical; the cost of respondent's well was approximately $400,000. In addition, geothermal water contains toxic minerals making it unfit for surface, agricultural or domestic use. Purification is not economically feasible. The water is so toxic that the Water Quality Control Board requires its reinjection deep into the earth. The analysis leading to the conclusion that geothermal resources are part of the mineral estate also leads to the conclusion that geothermal water is

a mineral and thus, not part of the waters included in the surface estate. Recognition of rights of the owner of the surface estate to geothermal water would mean that resources consisting of hot rock without any fluid system belong to the mineral estate while fluid geothermal systems, like that in the present case, would be subject to a divided ownership with the surface estate owner having an interest in the water, and the mineral estate owner having an interest in any commercially valuable dissolved minerals. The difficulties of determining the type of system or systems on a particular property, as well as the confusion and complexity attendant to such an approach, are clear.

Examining both the broad purpose of the 1951 conveyance of the mineral estate and the expected manner of enjoyment of this property interest, it appears that the rights to the geothermal resources are part of the grant. A principal purpose of this conveyance was to transfer those underground physical resources which have commercial value and are not necessary for the enjoyment of the surface estate. (See *Western Development Company* v. *Nell* (1955) 4 Utah 2d 112 [288 P.2d 452, 455].) The trial court correctly determined that the mineral grant herein conveyed to respondent the right to the geothermal resources located in, on or under the property in question.

Judgment is affirmed.

Feinberg, J., and Draper, J.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 26, 1978. Mosk, J., was of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.