OCCIDENTAL GEOTHERMAL, INC., a corporation, Plaintiff,

v.

Charles T. SIMMONS, Individually, and as Conservator of the Estate of Octavia Simmons, Conservatee, and Robert M. Curtis, Trustee of the Marital Trust under the Will of William W. Simmons, Jr., Defendants,

The United States; James Watt, in his capacity as Secretary of the Interior; and William French Smith in his capacity as Attorney General of the United States, Additional Defendants Aligned in Interest With Plaintiff,

Binkley Ranch Club, Frank Palmieri, Hummingbird West, a California corporation, Thomas E. Binkley and Robert W. Binkley, Carolyn M. Henderson, Henry P. Spaletta, Jr. and Nancy Spaletta, and Charles Gates, Intervenors.

CALIFORNIA DEPARTMENT OF WATER RESOURCES, Plaintiff,

v.

BINKLEY RANCH CLUB, a corporation, Defendant,

United States of America, Defendant Aligned in Interest with Plaintiff.

Nos. C-81-0510, C-82-0911.

United States District Court, N. D. California.

July 15, 1982.

Tony J. Tanke, Lombardi & Lombardi, Knudson, Tanke & Scholz, Berne Reuben, Griffinger & Levinson, San Francisco, Cal., for Occidental Geothermal, Inc.

Philip C. Fullerton, Fullerton, Lang, Richert & Patch, Fresno, Cal., for Robert M. Curtis.

Peter F. Windrem, Lakeport, Cal., for Binkley Ranch Club, Frank Palmieri, Hummingbird West, Thomas E. Binkley, Nancy Spaletta, Charles Gates, Robert W. Binkley, Carolyn H. Henderson and Henry P. Spaletta, Jr., intervenors.

David E. Golay, Asst. U. S. Atty., San Francisco, Cal., Susan V. Cook, Dept. of Justice, Washington, D. C., for Federal defendants.

Michael L. McQueen, James N. Barkeley, Los Angeles, Cal., for Union Oil Co. of California—amicus curiae.

N. Gregory Taylor, Asst. Atty. Gen., Dennis M. Eagan, Joseph Barbieri, M. Anne Jennings, Deputy Attys. Gen., San Francisco, Cal., for Cal. Dept. of Water Resources.

## OPINION

PATEL, District Judge.

## I. THE PROPHECY

In the early 1900s Congress enacted a number of statutes opening up public lands for agricultural and homestead settlement, subject to a reservation of mineral rights to the United States. One of those statutes was the Stock-Raising Homestead Act of December 29, 1916, 43 U.S. §§ 291–301 (hereinafter the "1916 Act").

In the long debates that preceded this legislation one congressman predicted that "this bill will encourage litigation. I cannot imagine a more fruitful source of lawsuits than this bill as it is now worded." 45 Cong.Rec. 6045 (1910).

## II. THE PROPHECY FULFILLED

The congressman's predictions have come true. This court now considers two cases, consolidated for pretrial purposes,[1] which arise under the 1916 Act. They are not the first fruits of the Act, but yet another yield from this bountiful source.

In *Occidental Geothermal, Inc. v. Simmons, et al.*, No. C–81–0510–MHP, plaintiff Occidental Geothermal sued Charles Simmons and Robert Curtis, owners of surface interests in land in the Geysers area of Lake and Sonoma Counties in Northern California, a region rich in subsurface geothermal steam. Simmons' and Curtis' surface rights were patented to their predecessors in interest by the United States pursuant to the 1916 Act, subject to a reservation of mineral rights to the United States. Occidental Geothermal holds a geothermal resources lease issued in 1979 by the Bureau of Land Management of the United States Department of the Interior pursuant to the Geothermal Steam Act of 1970, 30 U.S.C. §§ 1001–1025 (hereinafter the "1970 Act"). Section 1 of this lease purports to grant to Occidental Geothermal the right to "drill for, extract, produce, remove, utilize, sell and dispose of geothermal steam and associated geothermal resources" in or under the lands patented to the predecessors of Simmons and Curtis,

> together with ... (b) The right to construct or erect and to use, operate and maintain within the leased area, together with ingress and egress thereupon all wells, pumps, pipes, pipelines, buildings, plants, sumps, brine pits, reservoirs, tanks, waterworks, pumping stations, roads, electric power generating plants, transmission lines, industrial facilities, electric, telegraph or telephone lines, and such other works and structures and to use so much of the surface of the land as may be necessary or reasonably convenient for the production, utilization and processing of geothermal resources or to the full enjoyment of the rights granted by this lease....

Occidental Geothermal sought, among other forms of relief, a declaratory judgment establishing its right to build and operate, on the parcel in question, the facilities described in this section of the lease, without the consent of Simmons and Curtis. Occidental Geothermal later amended its complaint to add the United States, the Secretary of the Interior, and the Attorney General as additional defendants aligned in interest with plaintiff, under the provisions of 28 U.S.C. § 2409a. A number of owners who hold surface interests originally patented under the 1916 Act in the area of the Geysers were permitted to intervene. These intervenors were Binkley Ranch Club, Frank Palmieri, Hummingbird West, Thomas Binkley, Robert Binkley, Carolyn Henderson, Henry Spaletta, Jr., Nancy Spaletta, and Charles Gates.

---

1. This order, among other things, consolidates for pretrial purposes two cases that turn on the same question of law.

Various parties then made and briefed cross-motions for summary judgment. Before the date set for hearing, however, Occidental Geothermal arrived at a proposed settlement of all claims pending between it and Simmons and Curtis. The federal government defendants then moved for and were granted leave to file a cross-claim against three of the intervenors: Frank Palmieri, Thomas Binkley, and Carolyn Henderson. The United States represents in its cross-claim that "as soon as possible" it plans to sell more leases purporting to grant to lessees the right to construct geothermal electric generating plants and associated facilities on 1916 Act lands, including those in which Palmieri, Binkley, and Henderson hold surface interests. The cross-claim seeks a declaratory judgment establishing that the right to construct such geothermal power plants on the surface of the cross-defendants' lands was among the rights reserved to the United States when certain interests in the lands were originally granted to private owners. The federal defendants have now moved for summary judgment as to this cross-claim.

In *California Department of Water Resources v. Binkley Ranch Club, a corporation, and the United States of America*, No. C–82–0911–MHP, plaintiff Department of Water Resources holds a lease that is identical in all relevant respects to that issued to Occidental Geothermal. It purports to grant geothermal power plant siting rights on the land of the Binkley Ranch Club, one of the intervenor-landowners in *Occidental Geothermal, Inc. v. Simmons, et al.* The Department of Water Resources seeks declaratory and injunctive relief establishing its right to construct and operate on the

Binkley Ranch Club land the facilities referred to in its geothermal resources lease, without the Binkley Ranch Club's consent. It has now moved for summary judgment. As this case and *Occidental Geothermal, Inc. v. Simmons et al.* turn on the same question of law, and as there appear to be no substantial factual differences between the cases relevant to that legal issue, the cases are hereby ordered to be consolidated for pretrial purposes, and the two motions will be disposed of together.[2]

## III. THE PROPHECY BECOMES THE LAW [3]

The 1916 Act provided that up to 640 acres of unappropriated, unreserved public land could be homesteaded and patented to each private owner. 43 U.S.C. § 291. The Act described the homesteader's possession of the land as a "stock-raising homestead entry," and it provided that such entries could only be made on lands officially designated by the Secretary of the Interior as "stock-raising lands." *Id.* It authorized the Secretary to designate as "stock-raising lands subject to entry . . . lands the surface of which is, in his opinion, chiefly valuable for grazing and raising forage crops, do not contain merchantable timber, are not susceptible of irrigation from any known source of water supply, and are of such character that six hundred and forty acres are reasonably required for the support of a family. . . ." 43 U.S.C. § 292.

The 1916 Act, however, also provides that all homesteading entries made and patents issued "shall be subject to and contain a reservation to the United States of all the coal and other minerals in the lands so

---

2. The intervenors and cross-defendants in *Occidental Geothermal, Inc. v. Simmons et al.*, No. C–81–0510–MHP, object to the timing of the federal defendants' motion for summary judgment as to their cross-claim. They point out that the cross-claim was deemed to be filed on the same day that the motion was filed, and they contend that this timing violates Fed.R. Civ.P. 56(a), which permits such motions "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party. . . ." But the federal defend-

ants' motion is timely because it was made more than 20 days after the action commenced and the intervenors have previously joined in a motion for summary judgment in this case on the very same issue of law. Further, the timing of the motion did not prejudice the cross-defendants.

3. "The prophecies of what the courts will do in fact, and nothing more pretentious, are what I mean by the law." O. W. Holmes, "The Path of the Law," *Collected Legal Papers* 173 (1921).

entered and patented, together with the right to prospect for, mine and remove the same." 43 U.S.C. § 299. It also provides that any person who has acquired from the United States the right to mine and remove the mineral deposits "may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of the coal or other minerals . . .," without the consent of the entryman or surface owner, upon the execution of a bond or undertaking to secure the payment of the amount of damages "to the crops or tangible improvements of the entryman or owner" occasioned by the mineral owner's occupation of the surface. Id.[4] It is undisputed that the interests now held by Palmieri, Binkley, Henderson, and the Binkley Ranch Club were originally patented pursuant to this Act.

In the 1970 Act, Congress authorized the sale by the Secretary of the Interior of "leases for the development and utilization of geothermal steam and associated geothermal resources . . . (3) in lands which have been conveyed by the United States subject to a reservation to the United States of the geothermal steam and associated geothermal resources therein." 30 U.S.C. § 1002. And, pursuant to this Act, the Secretary has promulgated regulations subject to which the Bureau of Land Management may issue geothermal leases for such lands. 43 C.F.R. §§ 3200 et seq. (1981).

In *United States v. Union Oil Co. of California*, 549 F.2d 1271 (9th Cir.), *cert. denied*, 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977), the court of appeals confronted the question whether the reserved rights of the United States to the "minerals" in lands patented under the 1916 Act to the predecessors of present surface owners include the rights to subsurface steam. In considering the intended scope of the mineral reservation in the 1916 Act, the court recognized that "Congress was not aware of geothermal power when it enacted the Stock-Raising Homestead Act in 1916," and that "it had no specific inten-

4. In its entirety, 43 U.S.C. § 299 reads as follows:

All entries made and patents issued under the provisions of sections 291–301 of this title shall be subject to and contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same. The coal and other mineral deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land laws in force at the time of such disposal. Any person qualified to locate and enter the coal or other mineral deposits, or having the right to mine and remove the same under the laws of the United States, shall have the right at all times to enter upon the lands entered or patented, as provided by said sections, for the purpose of prospecting for coal or other mineral therein, provided he shall not injure, damage, or destroy the permanent improvements of the entryman or patentee, and shall be liable to and shall compensate the entryman or patentee for all damages to the crops on such lands by reason of such prospecting. Any person who has acquired from the United States the coal or other mineral deposits in any such land, or the right to mine and remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of the coal or other minerals, first, upon securing the written consent or waiver of the homestead entryman or patentee; second, upon payment of the damages to crops or other tangible improvements to the owner thereof, where agreement may be had as to the amount thereof; or, third, in lieu of either of the foregoing provisions, upon the execution of a good and sufficient bond or undertaking to the United States for the use and benefit of the entryman or owner of the land, to secure the payment of such damages to the crops or tangible improvements of the entryman or owner, as may be determined and fixed in an action brought upon the bond or undertaking in a court of competent jurisdiction against the principal and sureties thereon, such bond or undertaking to be in form and in accordance with rules and regulations prescribed by the Secretary of the Interior and to be filed with and approved by the officer designated by the Secretary of the Interior of the local land office of the district wherein the land is situate, subject to appeal to the Secretary of the Interior or such officer as he may designate: *Provided*, That all patents issued for the coal or other mineral deposits herein reserved shall contain appropriate notations declaring them to be subject to the provisions of sections 291–301 of this title with reference to the disposition, occupancy, and use of the land as permitted to an entryman under said sections.

tion either to reserve geothermal resources or to pass title to them." *Id.* at 1273. But it concluded that "the words of the mineral reservation in the ... Act clearly are capable of bearing a meaning that encompasses geothermal resources," and that it would further Congress' purposes to interpret these words as carrying this meaning. *Id.* at 1274. The court found these purposes to be "to transfer to private ownership tracts of semi-arid public land capable of being developed by homesteaders into self-sufficient agricultural units engaged in stockraising and forage farming, but to retain subsurface resources, particularly mineral fuels, in public ownership for conservation and subsequent orderly disposition in the public interest." *Id.*[5]

■ In the cases *sub judice*, the questions are whether the 1916 Act's mineral reservation should be construed broadly enough to encompass geothermal electric generating plant siting rights, and if so, whether the 1970 Act authorizes the grant of these rights by the United States. This court concludes that power plant siting rights in lands patented under the 1916 Act were reserved to the United States; and it also concludes that the 1970 Act does authorize the leases that are the subjects of these suits.

The starting point of the analysis is the undisputed fact that geothermal energy must be exploited, if it is to be exploited at all, on the lands from which it is to be removed.[6] It is the geothermal steam heat and pressure that are used to produce energy. Of course, when steam is allowed to escape or is transported long distances, it loses its heat and pressure. If the steam cannot be used at the source, but rather must be conducted through pipes to distant electric generating facilities, thereby exposing it to friction and heat loss, it loses its practical utility as a source of electrical energy. In this respect geothermal energy differs from other mineral sources of energy reserved to the United States by the 1916 Act, such as coal[7] or oil, which can feasibly be mined and removed for subsequent utilization in the production of electricity in far-distant locales.

For this reason, the "removal" of geothermal resources is inextricably connected to their "utilization." Indeed, because these resources cannot be "removed" without first being "utilized" (to the extent of being converted into electrical energy), the

5. *Pariani v. State*, 105 Cal.App.3d 923, 164 Cal. Rptr. 683 (1980), is the state-law equivalent of the *Union Oil* case.

6. The parties agree on this characteristic of geothermal energy production. *See* Memorandum of Points and Authorities of Federal Defendants on the Motion for Summary Judgment at 10; Memorandum of Cross-Defendants and Intervenors in Opposition to Motion for Summary Judgment at 3; Memorandum of California Department of Water Resources in Support of Motion for Summary Judgment at 23–24. *See also Pariani v. State*, 105 Cal.App.3d at 928, 164 Cal.Rptr. at 686; H.R.Rep.No.1544, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad.News 5113, 5129; General Accounting Office, *The Impact of Geothermal Development on Stockraising Homestead Landowners* 35 (April 16, 1981); Olpin, *The Law of Geothermal Resources*, 14 Rocky Mountain Mineral Law Institute 123, 128 (1968).

In the instant case, there is undisputed evidence that each of the currently operating geothermal electric generating plants in the region of the Geysers uses steam taken from a number of different wells and transported to the generating facility by means of pipes. But the great majority of wells are no farther than three-quarters of a mile from the generating facility they supply. Declaration of Paul A. Witherspoon in Support of Plaintiff Occidental Geothermal, Inc.'s Motions for Partial Summary Judgment and for Preliminary Injunction, incorporated as Exhibit C in Memorandum of California Department of Water Resources in Support of Motion for Summary Judgment.

7. There appear to be some exceptions to this in the case of low-grade lignite coal, which is high in moisture and ash content and is utilized at or near the mouth of the mines.

In fact, it was pointed out in the Congressional debates on the Coal Lands Act of 1910, 30 U.S.C. §§ 83–85, which contains reservation, entry, removal, and disposal provisions similar to those of the 1916 Act, that the western lands affected by the agricultural entry laws were believed to contain low-grade lignite, which could not be burned anywhere except ten feet from the mouth of the mine. 45 Cong.Rec. 6052 (1910). The severe impact this would have upon the surface owner's interest is obvious.

two processes can, in the case of geothermal energy, be said to be one. The 1916 Act's language reserving to the United States "the right to prospect for, mine *and remove*" minerals such as geothermal resources, as well as the language reserving to the mineral owner the right to "reenter and occupy so much of the surface thereof as may be required for *all purposes reasonably incident to the mining or removal* of the coal or other minerals," 43 U.S.C. § 299 (emphasis supplied), is therefore capable of bearing a meaning that encompasses the utilization of geothermal resources, to the extent that utilization and removal are the same process.[8]

The remaining question, in construing the 1916 Act, is whether Congress' purposes would be furthered by interpreting the words of the Act as carrying such a meaning. To answer this question is necessarily to resolve an inevitable conflict between the rights of the patentees' successors in interest and those of the United States and its lessees in the use of the surface. Clearly, Congress in enacting the 1916 Act contemplated that the stock-raising homesteaders to whom the surface rights were to be conveyed—and on favorable terms—would be required to submit to substantial use of that surface by those to whom the mineral estate was to be granted, so long as that use was for purposes reasonably incident to the mining or removal of minerals. *See Bourdieu v. Seaboard Oil Corp. of Delaware*, 38 Cal.App.2d 11, 100 P.2d 528 (1940); *Reno Livestock Corp. v. Sun Oil Co.*, 638 P.2d 147 (Wyo.1981); *Holbrook v. Continental Oil Co.*, 73 Wyo. 321, 278 P.2d 798 (Wyo. 1955).

This is borne out by the debates on the Coal Lands Act of 1910, 30 U.S.C. §§ 83–85. Section 3 of that Act, 30 U.S.C. § 85, contains reservation, entry, removal, and disposal provisions similar to the succeeding agricultural entry laws of 1910, 1914, and the 1916 Act. The following colloquy between Congressman Ferris, a strong proponent of government reservation rights, and Congressman Ames is particularly instructive.

> Mr. AMES. Might not the prospectors or miners going in necessarily destroy the entire surface of the homestead?
>
> Mr. FERRIS. Oh, I think perhaps they might in isolated cases.
>
> Mr. AMES. Then, do not you think he ought to pay for it?
>
> Mr. FERRIS. In any event the homesteader takes the land knowing it is coal land.
>
> Mr. AMES. Do not you think in equity such coal miners ought to pay for damages, even if necessary damages?
>
> Mr. FERRIS. They ought to pay for the damages if necessarily incident to the mining and removal of the coal. That is my proposition; and if the homesteader does not want to enter the surface for land worth $10 an acre for agriculture that is worth $400 and $500 for coal, with the coal carefully reserved, this Government can very well let him stay off it altogether.

45 Cong.Rec. 6046 (1910).

That great portions of the surface would be used for mining and related activities was certainly brought to the attention of Congress. A coal company president and a mining engineer spelled out in detail the expansive surface areas needed for mining purposes. *See* 45 Cong.Rec. 6053–55 (1910). A similar notion was recognized in adopting the 1916 Act when it was noted that major portions of the surface might be used in mining and removal and that the patentee could receive no payment except for damages to crops or improvements. 53 Cong.

---

**8.** It should be noted that this statement is true only to the extent that utilization is an integral and essential part of the process of removal (i.e., only to the extent that the energy contained in the steam *must* be converted into some other form before it can feasibly be removed and put to work elsewhere). The word "removal" in the 1916 Act's mineral reserva-

tion would not be capable of bearing a meaning that encompasses the on-site use of geothermal energy to power the production of goods other than energy. The owner of the mineral estate could not, for example, rely on this language to build a chemical plant or a greenhouse powered directly by the earth's heat without obtaining the consent of the surface owner.

Rec. 1233 (1916). The subsequent case law has similarly interpreted the reservation statutes.

In *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961 (1928), the Supreme Court had occasion to construe similar mineral reservations in the Act of July 17, 1914, 30 U.S.C. §§ 121–123, and the Act of February 25, 1920, 30 U.S.C. §§ 181 *et seq.* Kieffer had made a homestead entry of certain public lands, which subsequently were patented to him. Pursuant to the Act of 1914, the patent reserved to the United States "all the oil and gas in the lands so patented, and to it, or persons authorized by it, the right to prospect for, mine and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the Act of July 17, 1914." 277 U.S. at 494–95, 48 S.Ct. at 582.

Sections 1 and 2 of the Act of 1914, 30 U.S.C. §§ 121–122, provided that deposits of certain minerals underlying the lands in question, including oil and gas, be reserved to the United States, " 'together with the right to prospect for, mine and remove the same,' meaning, of course [the Court said], the right to use so much of the surface as may be necessary for such operations." 277 U.S. at 504, 48 S.Ct. at 583. Read together with the Act of 1920, which provided for the leasing of these mineral rights, the Act of 1914 disclosed "an intention to divide oil and gas lands into two estates for the purposes of disposal—one including the underlying oil and gas lands and the other the surface—and to make the latter servient to the former, which naturally would be suggested by their physical relation and rela-

tive values." *Id.* The right to extract and remove the oil and gas carried with it the "appurtenant right to use the surface so far as may be necessary," without compensating the patentee for anything except damage to "crops and improvements" as provided in the Act of 1914, the Court concluded. *Id.* at 504–05, 48 S.Ct. at 583–84.

Thus, permissible uses of the surface by the mineral lessee included not only drilling and storage of equipment and supplies, but also the construction of buildings to house its workers. *Id.* at 505, 48 S.Ct. at 584. These uses were allowed to preclude the use of the surface by the patentee and the purchasers of his surface interest for the construction of a town. *Id.* at 505–06, 48 S.Ct. at 584.[9]

Because of the similarity of the statutes involved, the reasoning and result in *Kinney-Coastal Oil* controls this case. Even if the preclusion of the patentees' surface use is severe, the dominance of the mineral estate's joint interest in the surface supports it.[10] This result may seem harsh, but it is no more so than the results in cases arising under both federal statutes and under state law in which the mineral estate's surface rights by implication predominated over—and to a very great extent obliterated—those of the fee owners of the lands. *See, e.g., Transwestern Pipeline Co. v. Kerr-McGee Corp.*, 492 F.2d 878 (10th Cir. 1974), *cert. dismissed*, 419 U.S. 1097, 95 S.Ct. 691, 42 L.Ed.2d 689 (1975) (mineral reservation to United States in patent, and leasing of mineral rights by United States, entitled mineral lessee, in removing subsurface potash, to subside the surface under natural gas pipelines and compressor station of sur-

---

**9.** The vitality of *Kinney-Coastal Oil* was recognized in *Transwestern Pipeline Co. v. Kerr-McGee Corp.*, 492 F.2d 878 (10th Cir. 1974), *cert. dismissed*, 419 U.S. 1097, 95 S.Ct. 691, 42 L.Ed.2d 689 (1975).

**10.** A different conclusion was reached in *Western Nuclear, Inc. v. Andrus*, 664 F.2d 234 (10th Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 2266, 73 L.Ed.2d 1282 (1982), involving the question whether gravel was a reserved mineral under the 1916 Act. This court is not impressed with that part of the rationale which seems to suggest that Congress could not have

contemplated gravel as being a reserved mineral, because such a holding would result in the destruction of the surface estate. To the extent that *Western Nuclear* relies upon the ordinary definitions of mineral, it is more persuasive. In addition, it distinguishes between gravel and geothermal steam on the grounds that the latter is a subsurface resource unrelated to the surface. Looking at the respective properties as resources only, that is true. As seen in this case, however, utilization may have a substantial effect on the surface.

face owner); *Harris v. Chas. Pfizer & Co.*, 385 F.2d 766 (8th Cir. 1967) (mineral reservation in private deed); *McDonnell v. Capital Co.*, 130 F.2d 311 (9th Cir.), *cert. denied*, 317 U.S. 692, 63 S.Ct. 324, 87 L.Ed. 554 (1942) (mineral reservation in private deed).[11] And in *Geothermal Kinetics, Inc. v. Union Oil Co. of California*, 75 Cal.App.3d 56, 141 Cal.Rptr. 879 (1977), while the court noted that the parties to the conveyance of a mineral estate "[g]enerally ... expect that the enjoyment of this interest will not involve destruction of the surface," 75 Cal. App.3d at 61, 141 Cal.Rptr. at 881, it nevertheless concluded that a private mineral grant impliedly included the right to construct geothermal power facilities on the surface of the property.[12]

The result in the instant cases is also required by the doctrine of *United States v. Union Pacific Railroad*, 353 U.S. 112, 116, 77 S.Ct. 685, 687, 1 L.Ed.2d 693 (1957), that land grants are to be "construed favorably to the Government, that nothing passes except what is conveyed by clear language, and that if there are doubts they are resolved for the Government, not against it." In *Union Pacific* the Court concluded, after applying this rule, that minerals underlying land in which a right of way was granted to a railroad were intended to be reserved to the United States. The Court noted the existence of a federal policy to reserve minerals to be administered and disposed of in the public interest, rather than to "endow[ ] the railroad with the untold riches underlying the right of way." *Id.*

In the instant cases, the court notes the existence of a 1916 Congressional "purpose to retain subsurface resources, particularly sources of energy, for separate disposition and development in the public interest,"

*United States v. Union Oil Co. of California*, 549 F.2d at 1279, rather than to create an additional windfall for stock-raising homesteaders, who were already being granted surface rights on favorable terms. *See generally*, H.R.Rep.No.35, 64th Cong., 1st Sess. 5 (1916); S.Rep.No.348, 64th Cong., 1st Sess. 2 (1916). It was this public purpose that persuaded the *Union Oil* court to read the mineral reservation "broadly." 549 F.2d at 1279. This court will do the same in the instant cases.

To do otherwise would not only do violence to the *Union Pacific* principle of construction, it would also contravene *Union Oil*. To hold that geothermal lessees own the rights to geothermal resources and yet do not have the right to exploit those resources without the consent of the owners of surface interests would reduce the holding of *Union Oil* to an empty theoretical exercise. This is a step the court is not prepared to take. Essentially, it would have the effect of vesting in the surface owner a co-ownership right in the mineral resources. This was exactly the result Congress sought to avoid. It was concerned about surface owners who, for a relatively modest price at that time, would speculate by purchasing land and holding up its exploitation for large damages or royalties. 45 Cong.Rec. 6052 (1910). In fact, the surface owner's right to royalties or a right to exclude was never contemplated by any of the agricultural entry laws. The adverse effect on surface owners' rights was discussed only in terms of damages to crops or improvements. 45 Cong.Rec. 6051 (1910); 53 Cong.Rec. 1233 (1916).

■ Geothermal power plant siting rights having been reserved to the United States by the patents issued under the 1916

11. In *MacDonnell*, the court declared it to be a universally recognized rule "that an expressed mineral reservation contained in a deed carries with it, by necessary implication, the right to remove such minerals ... by the usual or customary methods of mining and thus reduce them to possession even though the surface ground may be wholly destroyed as a result thereof." 130 F.2d at 320. *But cf. Smith v. Moore*, 172 Colo. 440, 474 P.2d 794 (1970) (mineral reservation in private deed does not im-

pliedly reserve right to completely destroy surface by strip mining for coal).

12. There is no suggestion in the evidence before the court on these motions that use of the surface by the holders of surface interests—including grazing, the surface use foreseen by Congress in 1916—would be entirely precluded by the construction and operation of geothermal power facilities.

Act, there remains the question whether the 1970 Act, which authorizes the leasing of reserved geothermal resources, also authorizes the leasing of the right to build and operate power plants on the surface. The court concludes that it does. Section 14 of the Act, as originally drafted, provided that the geothermal resources lessee "shall be entitled to use so much of the surface of the land as may be found by the Secretary to be necessary for the production and conservation of geothermal resources." In a statement submitted by Southern California Edison Company, a public utility, to the Senate subcommittee responsible for the bill, it was recommended that proposed § 14 be amended to read: ". . . for the production, *utilization* and conservation of geothermal resources." *Geothermal Steam Act of 1970: Hearings on S.368 Before the Subcommittee on Minerals, Materials and Fuels of the Senate Committee on Interior and Insular Affairs*, 91st Cong., 2d Sess. 97 (1970). Southern California Edison said that it was recommending the change in wording "to clarify the intent that the lessee may construct generating facilities on the leased land. . . ." *Id.* The change was made, and § 14 was enacted as 30 U.S.C. § 1013.

This interpretation of the 1970 Act is consistent with this court's reading of the disposal provisions of the 1916 Act. The various agricultural entry laws, including the 1916 Act, provide that "the coal and other mineral deposits in such lands shall be subject to disposal by the United States in accordance with the coal and mineral land laws in force at the time of such disposal." 43 U.S.C. § 299. This was in anticipation of future legislation for the disposition of mineral deposits. Leasing of deposits was specifically contemplated as coming within this provision. 45 Cong.Rec. 55 (1910).

The 1970 Act is one of the enactments effectuating the disposal clause. It controls

the leasing of geothermal resources and such other activities as are necessary to the removal and utilization of those resources. Congress did not exceed its 1916 reservation of mineral rights by enacting the 1970 Act.[13] In fact, the 1970 disposition provisions are consonant with the policies of the agricultural entry laws.

For the foregoing reasons, summary judgment is granted in favor of the United States, the Secretary of the Interior, and the Attorney General in C–81–0510 MHP, and in favor of the California Department of Water Resources in C–82–0911 MHP.

IT IS SO ORDERED.

---

**13.** The broad language of the geothermal resources lease (Exhibit 1 to Plaintiff California Department of Water Resources Motion for Summary Judgment) issued by the Bureau of Land Management pursuant to the 1970 Act is noted. This court is not called upon to determine the validity of the lease terms. A suggestion is offered in light of the court's extensive

review of the applicable statutes and their legislative history. The government can only lease what it has reserved to itself. Therefore, any grant of rights beyond what is reasonably necessary to the entry, prospecting, mining, removal, and, in the case of geothermal resources, utilization would in all likelihood be invalid.