**R & R ENERGIES, a Utah corporation, Plaintiff and Appellant,**

v.

**MOTHER EARTH INDUSTRIES, INC., a corporation, Defendant and Appellee.**

No. 950056.

Supreme Court of Utah.

March 28, 1997.

Rehearing Denied April 29, 1997.

Raymond N. Malouf, Logan, for plaintiff and appellant.

Jack L. Schoenhals, Salt Lake City, for defendant and appellee.

HOWE, Justice:

Plaintiff R & R Energies, Inc. ("R & R"), appeals from a final judgment by the trial court in favor of defendant Mother Earth Industries, Inc. ("MEI"), dismissing R & R's complaint and granting MEI attorney fees. R & R assails a protective order granted by the trial court that prohibited R & R from conducting certain discovery and an order denying R & R's motion to amend its complaint. R & R seeks reversal of the protective order and the award of attorney fees and asks that it be allowed to amend its complaint and that judgment as a matter of law be entered in its favor or, in the alternative, that the case be remanded for trial.

## FACTS

R & R filed this action to enforce the terms of a settlement agreement it entered into with MEI in 1982 that resolved a suit between them then pending in federal district court. The federal suit arose from a dispute surrounding certain geothermal energy fields near Cove Fort, Utah. MEI had attempted to develop the fields into a viable source of geothermal energy that could be used in the production of electricity at the same time that R & R was attempting to construct an ethanol plant on the fields. Because R & R claimed that MEI had interfered with its endeavors to build the ethanol plant, it filed suit for damages.

The six-page settlement agreement that terminated the federal suit, dated June 16, 1982, required that MEI pay 0.5 percent of its "gross geothermal energy sales revenue," minus federal royalty payments, to R & R and a higher percentage from a specific well called "Well 42–7." After the settlement, MEI negotiated a preliminary power purchase agreement with Provo City. On the strength of this agreement, MEI began drilling wells in an attempt to tap into the geothermal energy. In 1983, MEI located a

viable geothermal energy source and by 1984 had completed two producing geothermal wells. Thereafter, Cove Creek Geothermal ("Cove Creek") was created by the president of MEI, Wayne A. Portanova, and his brother-in-law, Thomas Canada, and Cove Creek constructed an electrical generating facility adjacent to the geothermal property.

Cove Creek's plant began producing in 1985. Cove Creek leased the geothermal resource from MEI, converted the geothermal energy into electricity, and sold the electricity produced to Provo City. Cove Creek paid MEI a steam fee of $0.015 per kilowatt hour ("kWh"). Pursuant to its interpretation of the settlement agreement, MEI deducted the federal royalty and then paid 0.5 percent[1] of the remainder to R & R.

The federal government values geothermal energy for purposes of calculating its royalty in several ways. If the steam is sold in an arm's-length transaction, the contract price is considered to be the actual value and the royalty is calculated on that amount. See Subpart H—Geothermal Resources, 30 C.F.R. § 206.352(b)(1)(i) (1996). If it is not sold in an arm's-length transaction, the federal government will look to other steam contracts with the same power plant or use the "netback procedure." 30 C.F.R. § 206.352(c)(1)(i), (ii) (1996). The netback procedure is a formula that begins with revenues from the electricity produced, a figure called "gross revenues," and then deducts all reasonable actual costs, including return on investment, to approximate the market value of the steam. 30 C.F.R. § 206.352(d)(1)(ii) (1996). MEI originally paid its 10 percent royalty on the actual sales price charged Cove Creek by MEI. However, after the Minerals Management Service ("MMS"), the branch of the Bureau of Land Management

that actually administers the leases, determined that the sale of steam to Cove Creek was not arm's-length, MEI began paying its royalty pursuant to the netback procedure.[2]

In 1987, R & R filed this suit in the trial court, claiming that (1) MEI received $.032/kWh in addition to its steam fee as a "capacity charge" that should be considered "gross geothermal energy sales revenues"; (2) MEI had received a $1 million development fee from Provo City that should be included as well; and (3) Well 42–7 was being used as a reinjection well, which entitled R & R to compensation pursuant to the settlement agreement. Additionally, R & R sought interest and attorney fees.[3] After filing its complaint, R & R developed and argued to the court on numerous occasions its claim that the settlement agreement entitled R & R to 0.5 percent of the revenues from electricity sold by Cove Creek to Provo City, although it did not amend its complaint to reflect this new theory.

During discovery, R & R served interrogatories on Provo City seeking information that MEI considered irrelevant and proprietary concerning the exact location of the wells, and their records, such as "down-hole logs," temperature gradients, pressures, temperatures, and flow rates. In response, MEI filed, and the trial court granted, a motion for a protective order prohibiting R & R from seeking or obtaining such information. R & R later moved to amend its complaint to add additional parties and claims. The trial court denied the motion.

Hoping to resolve the case without a trial, MEI moved for summary judgment.[4] However, because R & R contended that the term "gross geothermal energy sales" had a spe-

---

1. Well 42–7 has never produced any steam, so the higher percentage of revenues that would be required from that well has never been paid.

2. When the netback procedure was imposed, the MMS recalculated the royalties already paid by MEI under the contract rate and determined that MEI had actually overpaid. Therefore, we believe the steam fee actually charged Cove Creek by MEI is representative of the market value of the geothermal energy. In addition, the Office of Inspector General conducted an audit of MEI in 1992 in response to complaints of fraud by R &

R. The audit concluded that its "analysis disclosed no serious internal control deficiencies."

3. R & R also petitioned the court to order that MEI issue checks to replace some royalty checks that had become stale.

4. The motion was actually entitled "Partial Motion for Summary Judgment." However, because the motion's final request was for an order dismissing plaintiff's complaint, we consider it to be a motion for complete summary judgment.

cialized meaning within the industry, the trial court stayed decision on the summary judgment motion and scheduled a "minitrial" limited to determining whether the term indeed had a specialized meaning. After hearing testimony from experts on both sides, the court ruled that the term did not have a specialized meaning and that, due to its plain and unambiguous language, the settlement agreement did not require MEI to pay a percentage of the revenues received from Provo City for the sale of electricity to R & R.

MEI then filed a second motion for summary judgment, which incorporated its prior motion for partial summary judgment, seeking judgment in its favor as well as attorney fees. The trial court granted the motion, holding that the settlement agreement did not entitle R & R to any payments for the sale of electricity to Provo or the use of Well 42–7, and granted MEI attorney fees. The court expressly reserved the issues of the amount of payments due by MEI to R & R under its interpretation of the settlement agreement and the amount of attorney fees to be awarded to MEI. To resolve those issues, the trial court ordered that MEI file a disclosure of payments due R & R, which MEI did. After R & R objected to the disclosure filed, MEI served "Requests for Admissions, Interrogatories, and Requests for the Production of Documents" on R & R, requiring that R & R either admit the accuracy of MEI's disclosure or demonstrate its inaccuracy. R & R did not respond until ordered by the court. Even then, rather than addressing MEI's request, R & R's response continued to argue against the trial court's earlier ruling that "gross geothermal energy" did not include electricity, and concluded with a list of "lies," numbered one through ten, that MEI had allegedly told the court. Basing its decision in part on R & R's lack of response and in part on MEI's supporting documents, which included detailed accounting and business records and an affidavit from Portanova, which demonstrated

that MEI's figures were prepared in the ordinary course of business and constituted the documents used to pay the federal royalties, the court ruled that MEI's accounting of the amount due was correct. It also ordered that plaintiff pay $63,301 in attorney fees and subsequently ordered plaintiff's counsel, Raymond Malouf, to pay $3,500 of those fees because of his "dilatory tactics and for filing pleadings that were not relevant or productive in the production of the case." A final judgment and order to that effect was thereafter entered, from which R & R appeals.

R & R contends that (1) the trial court erred in ruling that the term "gross geothermal energy sales" is unambiguous and does not include proceeds from the sale of electricity by Cove Creek to Provo City; (2) the trial court erred in granting summary judgment on the issue of whether Well 42–7 was "producing"; (3) the trial court erred in entering a protective order prohibiting R & R from obtaining certain information from Provo City; (4) the trial court erred in refusing to allow R & R to amend its complaint to join additional parties and allege fraud; and (5) the trial court erred in awarding attorney fees to defendant and making plaintiff's counsel personally liable for a portion of them.

## ANALYSIS

### A. Interpretation of the Settlement Agreement

The settlement agreement provides that "MEI shall pay to R & R one-half of one percent (0.5%) of the gross geothermal energy sales revenues received by MEI after deductions of amounts paid as federal royalty payments from the geothermal field owned by MEI." After the minitrial, in which four experts testified, the court found that "the term 'geothermal energy' is understood in the industry to mean the natural heat of the earth which can be extracted in the form of hot water and/or water vapor and/or [sic] both."[5] The trial court further concluded:

---

5. The court also stated, under the heading of "Findings of Fact," that "Paragraph 2 of the Settlement Agreement does not provide for revenues to be paid upon any products resulting from the sale of the geothermal energy such as electri-

cal energy produced therefrom." However, we think this is better classified as a conclusion of law because the trial court ruled that the settlement agreement was unambiguous and was therefore interpreting the language of the con-

"The gross geothermal energy sales revenues received, shall therefore be only those revenues received by Defendant from the sale of the geothermal energy, and do not include revenues received from products produced by virtue of the utilization of the geothermal energy." On the basis of its ruling that no specialized meaning existed, the court concluded that the agreement was unambiguous and granted summary judgment in favor of MEI, reserving the issues of the amount owed by MEI and the amount of MEI's attorney fees for future determination.

R & R contends that the trial court erred in granting summary judgment in favor of MEI because the settlement agreement is ambiguous and interpretation of the contract should have been preserved for trial. *See, e.g., Saunders v. Sharp,* 806 P.2d 198, 200 (Utah 1991) ("The interpretation of a contract is a matter of law for the court to determine unless the contract is ambiguous and evidence of the parties' intent (which is a matter of fact) is necessary to establish the terms of the contract."); *Records v. Briggs,* 887 P.2d 864, 871 (Utah.Ct.App.1994) ("Generally, when contract interpretation will be determined by extrinsic evidence of intent, it becomes a question of fact."). "Of course, a motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended." *Faulkner v. Farnsworth,* 665 P.2d 1292, 1293 (Utah 1983) (citing *Grow v. Marwick Dev., Inc.,* 621 P.2d 1249 (Utah 1980)).

Language in a contract is "ambiguous" when it is reasonably capable of being understood in more than one sense. . . . Ambiguity of language is to be distinguished from unintelligibility and inaccuracy, for words cannot be said to be ambiguous unless their signification seems doubtful and uncertain to persons of competent skill and knowledge to understand them.

*Black's Law Dictionary* 73 (5th ed. 1979). "However, a contract provision is not necessarily ambiguous just because one party gives that provision a different meaning than another party does. To demonstrate ambiguity, the contrary positions of the parties must each be tenable." *Plateau Mining Co. v. Utah Div. of State Lands & Forestry,* 802 P.2d 720, 725 (Utah 1990) (citation omitted).

Under this definition, R & R's contention that the settlement agreement is ambiguous takes two potential forms: First, it could be an attack on the trial court's factual finding that no specialized meaning exists in the industry. A specialized meaning would create ambiguity because at least two plausible meanings, one "plain" and one "specialized," would exist. Second, it could be an attack on the trial court's conclusion that the plain language of the contract has only one tenable meaning. Although R & R's brief is far from clear as to whether it is relying on the first or the second theory (or both), elements of both arguments are present. Therefore, we will address each.

This court will not disturb the trial court's factual finding that the term "gross geothermal energy sales" has no specialized meaning in the industry, unless it is clearly erroneous. *See* Utah R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). "A trial court's factual finding is deemed 'clearly erroneous' only if it is against the clear weight of the evidence." *Doelle v. Bradley,* 784 P.2d 1176, 1178 (Utah 1989) (citations omitted).

Having thoroughly reviewed the record, we cannot conclude that the trial court's finding of fact that no specialized meaning exists

---

tract itself. It is well settled by our prior case law that when a contract is in writing and the language is unambiguous, the intention of the parties must be determined from the words of the agreement and that a contract interpreted without regard to extrinsic evidence is a question of law. *See, e.g., Faulkner v. Farnsworth,* 665 P.2d 1292, 1293 (Utah 1983). Therefore, the

trial court's conclusion as to the meaning of the second paragraph of the settlement agreement, which must have been derived from the text of the agreement itself (inasmuch as the court determined that the agreement was unambiguous), is better categorized as a conclusion of law rather than as a finding of fact.

was against the clear weight of the evidence. For example, Kenneth Powell, plaintiff's principal expert witness, testified that he had formed an opinion on the meaning of the phrase "gross geothermal energy sales" by examining the settlement agreement and some industry publications and by researching some Utah Power and Light contracts. That is scant support for the proposition that there is a specialized meaning of the phrase throughout the industry, which was the only issue before the trial court. In addition, Powell admitted that he had never read an article or a contract that equated the terms "geothermal energy" and "electrical power output." At another point, he testified that geothermal energy is defined as "energy that comes from the heat of the earth," which he stated was also the dictionary definition and the definition used in the industry. In view of the fact that plaintiff's own expert offered testimony supporting the court's interpretation, we cannot hold that the trial court's finding is against the clear weight of the evidence, and therefore, we refuse to upset its factual finding that no specialized meaning exists.

■ We next address whether the trial court erred in ruling that the contractual language itself, even without a specialized meaning, is not open to more than one reasonable interpretation and is therefore unambiguous. R & R asserts that "gross geothermal energy sales" could reasonably be considered the steam harvested and sold by MEI or it could mean the electrical energy that Cove Creek produced from the geothermal energy and sold to Provo City. This argument is essentially an attempt to equate geothermal energy and electrical energy, for that is the only way that "gross geothermal energy" can include the electricity sold by Cove Creek. In support, R & R points out that geothermal energy is largely unmarketable in its "raw" form and that electrical energy is merely an altered form of geothermal energy that allows it to be stored, marketed, and transported. R & R cites one case from another jurisdiction, as well as the

Code of Federal Regulations, that allegedly stands for the proposition that geothermal energy has been equated at times with electrical energy. We find this argument to be without merit.

First, and most important, R & R's interpretation conflicts with the ordinary meaning of "gross geothermal energy sales revenues." Geothermal energy is commonly understood to mean hot water, steam, or hot brines at a high temperature and the heat and pressure therefrom. *Accord* 30 C.F.R. § 206.351; Utah Code Ann. § 73–22–3(4), (5) (1989).[6] According to this definition, "gross geothermal energy sales" is the gross amount received by MEI from the sale of hot steam, water, or brines to Cove Creek, as the trial court ruled. Thus, the plain meaning of the term does not correspond with R & R's interpretation.

Second, there is no legal foundation for the proposition. The one case cited by plaintiff to justify its argument that geothermal and electrical energy are the same, *Occidental Geothermal, Inc. v. Simmons*, 543 F.Supp. 870 (N.D.Cal.1982), offers little support. The issue in *Occidental Geothermal* was whether plaintiffs who had been granted a right to extract geothermal energy under federal law also had the right to site a "geothermal electric generating plant," *id.* at 874, on the producing land. In dicta, the court stated that "because [geothermal] resources cannot be 'removed' without first being 'utilized' (to the extent of being converted into electrical energy), the two *processes* can, in the case of geothermal energy, be said to be one." *Id.* at 874–75 (emphasis added). The court also observed, "If steam cannot be used at the source, but rather must be conducted through pipes to distant electrical generating facilities, . . . it loses its practical utility as a source of electrical energy." *Id.* at 874. Thus, the court held that to give effect to the federally granted right to use the resource, the act must be interpreted to include the right to site an electrical generating facility on the producing land because geothermal energy cannot be extracted and then trans-

6. As noted above, this definition also corresponds with that proposed by R & R's expert, Kenneth Powell, at the minitrial.

ported to a distant electrical generating facility like other energy sources. *Id.* at 876. However, the court did not state, imply, or hold that electrical and geothermal energy are the same. Indeed, implicit in the court's analysis, including the portion cited above, is the notion that the two, although related, remain distinct and that geothermal energy is merely a *source* of electrical energy, not its equivalent. Thus, *Occidental Geothermal* actually supports the proposition that geothermal and electrical energy are distinct and therefore supports the trial court's interpretation of the settlement agreement.

Although R & R cites only one case in favor of its argument, a much larger portion of its brief is devoted to marshaling and attempting to distinguish MEI's numerous supporting case cites. R & R maintains that MEI's "references actually refute the trial court's interpretation of 'gross geothermal energy sales revenues,' or fail to justify the court because they are not relevant." We disagree. After thoroughly reviewing all seventeen cases, we fail to find a single one that supports R & R's argument that geothermal and electrical energy are synonymous, but we find many that support, at least in dicta, MEI's position that the two are distinct. For example, many compare or analogize geothermal energy to coal, oil, and other energy sources that are used to generate electrical energy, but none of them compare or analogize geothermal energy to electrical energy itself. In *Geothermal Kinetics v. Union Oil Co. of California*, 75 Cal.App.3d 56, 141 Cal.Rptr. 879 (1977), the court stated:

> [T]he production of energy from geothermal resources is analogous to the production of energy from such other mineral resources as coal, oil and natural gas in that materials containing energy are extracted from the earth and transported to facilities where this energy is transformed into electrical energy. The fact that extracted coal, oil and natural gas contain chemical energy while geothermal resources contain thermal energy is not sig-

nificant; uranium ore is not denied the status of a mineral because it contains nuclear energy instead of chemical energy.

141 Cal.Rptr. at 882 (footnote omitted). In *United States v. Union Oil of California*, 549 F.2d 1271 (9th Cir.1977), the court noted, "Salt water and geothermal steam and brines should be held the property of the mineral owner who owns such substances as oil, gas and coal, since the functions and values are more closely related. Geothermal steam is a source of energy just as fossil fuels such as oil, gas and coal are sources of energy." *Id.* at 1279 n. 18 (citing Olpin, *The Law of Geothermal Resources*, 14 Rocky Mtn. Min. L.I. 123, 140–41 (1968)). There is simply no support for R & R's proposed interpretation of the settlement agreement in the case law brought to our attention or that we could locate on our own initiative.

R & R next relies upon the C.F.R. definition of "gross proceeds": "the total monies and other consideration accruing to a geothermal lessee for any disposition of geothermal resources *including total payments for the sale of electricity generated by the lessee from lease-produced geothermal resources.*" 30 C.F.R. § 206.351(4) (emphasis added). R & R then states in its brief, "The government defines *gross* proceeds for royalty purposes the same way R & R wants them defined." However, this comparison of terms is inapposite because although both "gross geothermal energy sales revenues" and "gross proceeds" contain the word "gross," they are not synonymous. The other portions of the regulation make it clear that the term "gross proceeds" is intended to be a rough equivalent of the revenue received for electrical energy, not the value of geothermal energy.

The term "gross proceeds" is used in the "netback" formula, part of a procedure used to determine the value of geothermal energy sold in a nonarm's-length transaction.[7] In the netback procedure, the government works backward to determine the value of steam in a situation where it appears that the

7. *Geothermal netback procedure* means the method of determining the value of geothermal resources that are utilized in a lessee-owned power plant for the generation and sale of electricity by deducting the lessee's reasonable, actual transmission and generating costs from the sales price or value of the electricity to derive the value of the geothermal resource at the power plant inlet.
30 C.F.R. § 206.351 (1996).

actual selling price of the geothermal energy might be artificially depressed because of the close relationship of the parties involved in the transaction. In essence, the netback starts with the *user's* gross revenue and then deducts all of its reasonable and actual expenses to determine a value for the geothermal energy used to produce the electricity. As stated in the C.F.R., "Under the geothermal netback procedure, the lessee's reasonable actual costs for the generation and transmission of electricity shall be deducted from the lessee's gross proceeds received for the sale of electricity *to determine the value of the geothermal resource.*" 30 C.F.R. § 206.352(d)(1)(ii) (emphasis added). Obviously, if reasonable generating and transmission costs are deducted from gross proceeds to determine the value of the geothermal resource,[8] then "gross proceeds" is not equivalent to the value of the geothermal resource/energy. Without a persuasive argument as to why the term "gross geothermal energy sales" in the settlement agreement should include the electricity produced and sold by Cove Creek, which R & R has not made, the comparison of the terms is circular and useless. Therefore, R & R's reliance on the definition of "gross proceeds" is misplaced.

Likewise, we reject R & R's argument that the two energy forms are equivalent because electrical energy is merely an altered form of geothermal energy that allows it to be marketed, transported, or stored. First, this argument is belied by the fact that the mining of geothermal energy and the conversion of that energy into electrical energy are often carried out by separate entities. The federal act makes this clear by distinguishing between arm's-length and nonarm's-length transactions for the sale of geothermal energy. An arm's-length transaction involves two unrelated parties, *see* 30 C.F.R. § 206.351, which demonstrates that geothermal energy in its "raw" form is marketable

to some degree, even if it cannot be transported long distances like other energy resources. Second, this argument completely ignores the fact that geothermal energy, just like coal, oil, natural gas, or water, must go through a conversion process to become electrical energy. That process requires equipment and facilities completely apart from those required to mine the resource. In light of these facts, geothermal energy and electrical energy can hardly be said to be one. Therefore, we reject plaintiff's contention that the term "gross geothermal energy sales" has more than one reasonable meaning and affirm the trial court's ruling that the settlement agreement is unambiguous.

▪▪▪ Having done so, we turn to interpreting the agreement. Our review of a trial court's interpretation of an unambiguous contract is for correctness because an unambiguous contract must be interpreted from the actual words of the contract. *See Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991). " 'Questions of contract interpretation not requiring resort to extrinsic evidence are matters of law, and on such questions we accord the trial court's interpretation no presumption of correctness.' " *Sackler v. Savin,* 897 P.2d 1217, 1220 (Utah 1995) (quoting *Zions First Nat'l Bank, N.A. v. National Am. Title Ins. Co.,* 749 P.2d 651, 653 (Utah 1988)).

▪▪▪ From our interpretation of the settlement agreement, we conclude that the trial court was correct when it determined that the "gross geothermal energy sales revenues received, shall ... be only those revenues received by Defendant from the sale of the geothermal energy, and do not include revenues received from products produced by virtue of the utilization of the geothermal energy" and that, therefore, "revenues received from the sales of electricity produced by conversion of geothermal energy into electrical energy are not subject to the provi-

---

8. The term "geothermal resources" is defined as:
 (1) All products of geothermal processes, including indigenous steam, hot water, and hot brines;
 (2) Steam and other gases, hot water, and hot brines resulting from water, gas, or other fluids artificially introduced into geothermal formations;

 (3) Heat or other associated energy found in geothermal formations; and
 (4) Any by-products.
30 C.F.R. § 206.351 (7–1–96). This corresponds with our stated definition.

sions of the Settlement Agreement." We hold that MEI is required to pay R & R only 0.5 percent of the amount it receives for geothermal energy from Cove Creek after deducting the federal royalties, as the trial court ruled.

■ Finally, given our interpretation of the term "gross geothermal energy sales," we address whether summary judgment was properly granted. Because our interpretation of the settlement agreement is the same as the trial court's, the issue is essentially whether genuine issues of material fact remained as to whether MEI had complied with the trial court's interpretation of the settlement agreement. For instance, R & R contends that it raised several issues of material fact regarding the amount MEI actually received for the sale of steam, which would impact the amount to which it was entitled. It asserts that the amounts MEI reported in this case differed from those reported to the government or disclosed in other cases.

Rule 56(e) of the Utah Rules of Civil Procedure states that a party opposing a properly supported motion for summary judgment, as MEI's motion was in this case, "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." While we have held that "under Rule 56, Utah R. Civ. P., it is not always required that a party proffer affidavits in opposition to a motion for summary judgment in order to avoid judgment against him," *Olwell v. Clark*, 658 P.2d 585, 586 (Utah 1982), we have also stated that "when a party opposes a properly supported motion for summary judgment and fails to file any responsive affidavits or other evidentiary materials allowed by Subdivision (e), the trial court may properly conclude that there are no genuine issues of fact unless the movant's affidavit affirmatively discloses the existence of such an issue." *Franklin Fin. v. New*

*Empire Dev. Co.*, 659 P.2d 1040, 1044 (Utah 1983).

In this case, the trial court, after granting summary judgment on the interpretation of the settlement agreement and other issues of liability, expressly reserved the issue of whether MEI had complied with the terms of the settlement agreement as the court had interpreted them. The court ordered MEI to file a disclosure of royalties due, which it did. Because R & R opposed that disclosure, MEI served requests on R & R for the specific bases for the objections along with admissible proof as required by rule 56(e). R & R's answers, instead of identifying witnesses, admissible testimony, or evidence, contained numerous pages of argument regarding the court's earlier rulings and attacks against MEI. Thereafter, MEI filed an additional motion for summary judgment that was opposed by R & R's two-page motion containing additional arguments against the court's earlier rulings and statements of opposition such as "R & R does not believe MEI will ultimately prevail" and "This motion is premature and unfounded." This utter failure by R & R to demonstrate the existence of any genuine issues of material fact, along with MEI's extensive support for its own motion, including over 125 pages of detailed accounting records and affidavits, justified the trial court's order granting summary judgment on the issue of whether MEI had complied with the trial court's interpretation of the settlement agreement.

### B. *Well 42–7*

Paragraph three of the settlement agreement obligates MEI to "pay to R & R ... $250,000 ... from gross revenues arising from geothermal energy sales specifically and exclusively derived from Well 42–7." It is undisputed that MEI is currently using Well 42–7 as an injection well,[9] and R & R asserts that MEI is obligated to compensate it for that use. The trial court disagreed and ruled that the settlement agreement did not

---

9. "Injection Well" means any special well, converted producing well, or reactivated or converted abandoned well employed for injecting material into a geothermal area or adjacent area to maintain pressures in a geothermal reservoir, pool, or other source, or to provide new material to serve as a material medium therein, or for reinjecting any material medium or the residue thereof, or any by-product of geothermal resource exploration or development into the earth.
Utah Admin. Code R655–1–1.2(*l*) (1994).

obligate MEI to make royalty payments in connection with this use. The question is once again one of contract interpretation, which we review for correctness.

■■■ Employing this standard, we find that the trial court's interpretation of the settlement agreement was correct. It is uncontested that there have been no "geothermal energy sales ... derived from Well 42–7." The settlement agreement does not require MEI to pay for simply using Well 42–7; it requires only that MEI pay a percentage of any revenue derived from steam produced by the well itself. If the settlement agreement employed the word "use" or one similar thereto, R & R might have a legitimate claim. However, because the agreement entitles R & R to only a percentage of "geothermal energy sales" from Well 42–7 and Well 42–7 has never produced any geothermal energy, R & R is not entitled to compensation.

Our interpretation is supported by the fact that R & R's rate of compensation, if it were entitled to any, would be based upon the amount of steam actually sold from the well. The settlement agreement provides that the amount paid "shall be one and one-half percent (1.5%) of the difference between gross revenues to MEI from geothermal energy sales from Well 42–7 and federal royalty payments related to said well." MEI correctly argues that if we were to award compensation to R & R for the use of the well for reinjection purposes, we would have absolutely no basis for determining the amount MEI is required to pay. Thus we would be required to divine a formula on our own and would thereby add a term to the parties' agreement that they did not include themselves. We refuse to engage in such a practice.

Therefore, we hold that according to the plain and clear language of the contract itself, MEI is not required to compensate R & R for using Well 42–7 for reinjection purposes. The trial court properly granted summary judgment on this issue as well.

### C. The Protective Order

■■■ R & R contends that the trial court erred by entering a protective order that prohibited R & R from obtaining discovery from Provo City of information that the court believed was "secret, proprietary, and confidential." MEI responds that "the trial court did not preclude R & R from conducting legitimate relevant discovery" but merely prevented it from "inquiring into confidential and proprietary information which was not relevant to the issue of royalties."

Rule 26(c) of the Utah Rules of Civil Procedure provides in part:

Upon motion by a party ... and for good cause shown, the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(1) that the discovery not be had;

...;

(4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters;

...;

(7) that a trade secret or other confidential research, development, or commercial information not be disclosed[.]

Generally, the trial court is granted broad latitude in handling discovery matters, see *Utah Dep't of Transp. v. Osguthorpe*, 892 P.2d 4, 6 (Utah 1995) (giving trial court broad discretion regarding imposition of discovery sanctions); *First Fed. Sav. & Loan Assoc. v. Schamanek*, 684 P.2d 1257, 1266 (Utah 1984), and we will "not find abuse of discretion absent an erroneous conclusion of law or where there is no evidentiary basis for the trial court's rulings." *Askew v. Hardman*, 918 P.2d 469, 472 (Utah 1996).

In this case, the trial court did not abuse its discretion by entering the protective order because there was sufficient evidence to support it and there was no erroneous conclusion of law. Accompanying its motion for a protective order, which was timely filed, MEI included several affidavits demonstrating that R & R had been, and continued to be, a competitor of MEI. In addition, the information sought from Provo City was clearly outside the realm of relevant informa-

tion. The information sought had little, if anything, to do with the amount that MEI received for the sale of steam and was highly sensitive information that would not have furthered the litigation but very well might have given R & R a competitive edge against MEI in future energy ventures. We therefore uphold the trial court's protective order.

### D. Joinder of Additional Parties and Claims

■ R & R contends that the trial court erred by refusing to allow it to amend its complaint to include additional parties and claims. Specifically, R & R moved the court to allow it to add Cove Creek Geothermal, Portanova, Canada, and Provo City and to allege fraud against MEI and Provo. The motion was dated January 30, 1991, and was filed subsequent to the minitrial and just over four years after the complaint was filed.

■ "After a responsive pleading has been filed, ... 'a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.'" *Hill v. State Farm Mut. Auto. Ins. Co.*, 829 P.2d 142, 149 (Utah.Ct.App.1992). However, it has long been this court's position that

> [r]ule 15(a), Utah Rules of Civil Procedure, ... is to be applied with less liberality when the amendments are proposed during or after trial, rather than before the trial. In any event, the granting of leave to amend is a matter which lies within the broad discretion of the court, and its rulings are not to be disturbed in the absence of a showing of an abuse of discretion resulting in prejudice to the complaining party.

*Girard v. Appleby*, 660 P.2d 245, 248 (Utah 1983); *see also Hill*, 829 P.2d at 149 ("A trial court's discretion to deny a motion for leave to amend is broad and its decision will not be disturbed absent an abuse of discretion." (citation omitted)).

We cannot find that the trial court's refusal to allow plaintiff to amend its complaint was an abuse of discretion given the facts of this case. The trial court was within its powers to deny R & R's motion to add new

parties and claims more than four years after the case commenced and after a trial had been held to resolve the fundamental issue in the case. This is especially true given the fact that R & R's complaint demonstrates that it knew that all of the parties it sought to add were involved with each other from the outset of the case and therefore that they could have been joined in a timely manner.

### E. Attorney Fees

■ R & R next contends that it was improper for the trial court to award attorney fees and costs to MEI and to order that counsel for R & R, Malouf, personally pay a portion of that amount. As to the issue of whether the trial court should have awarded attorney fees to MEI as the prevailing party, we find that the trial court was entirely correct in making an award of the amount MEI had spent defending the case. The settlement agreement stated, "Should a party to this Agreement bring suit for a breach of this Agreement, the prevailing party in such suit may be awarded costs and attorney fees incurred in the prosecution or defense of the action." Thus the trial court was simply enforcing the will of the parties, as expressed in the settlement agreement, when it awarded attorney fees to MEI, the prevailing party.

■ Regarding the trial court's order that Malouf be personally responsible for a portion of those fees, we do not believe that the trial court's order was improper. Rule 11 requires that an attorney practicing before Utah courts sign documents filed with the court certifying

> that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Utah R. Civ. P. 11. We agree with the court of appeals that "[r]ule 11 gives trial courts great leeway to tailor the sanction to fit the requirements of the particular case" and that

"we will affirm the particular sanction imposed by the trial court ... absent an abuse of discretion." *Taylor v. Estate of Taylor,* 770 P.2d 163, 171 (Utah.Ct.App.1989). Here the trial court based its ruling on Malouf's "dilatory tactics and ... filing pleadings that were not relevant or productive in the prosecution of this case." After reviewing the record, we agree that Malouf has engaged in numerous dubious acts during the pendency of this case.[10] In light of his improper and oppressive conduct, the trial court did not abuse its discretion by ordering that he personally pay a portion of MEI's attorney fees.

 MEI has also asked this court for attorney fees on appeal. Since MEI has once again fully prevailed, an award of attorney fees on appeal is proper. We remand to the trial court for a determination of the amount of reasonable attorney fees spent by MEI on this appeal and order that MEI be awarded the amount determined by the trial court.

The judgment is affirmed and the case remanded for a determination of MEI's attorney fees on appeal.

STEWART, Associate C.J., concurs in Justice HOWE's opinion.

ZIMMERMAN, Chief Justice, concurring:

I concur fully in the majority opinion. However, I write to state that this matter should be referred to Bar Disciplinary Counsel.

The majority characterizes Mr. Malouf's conduct in violation of rule 11 as "improper and oppressive," states that his "disobedience to court orders and oppressive litigation tactics that waste court resources and require opponents to spend a great deal of money in defense thereof appear to be characteristic of Malouf's practice," and notes that on two occasions we have upheld sanctions against him for analogous misconduct. *See* Rules of Professional Conduct Rules 3.3, 3.4, 8.4. In my view, the time has come for Bar counsel to review Mr. Malouf's conduct for possible disciplinary proceedings.

Lawyers and judges increasingly complain about the public's negative perception of the Bar. They properly observe that the public unfairly tars the vast majority of lawyers with a brush that should be reserved for a select few miscreants. The only way that the public's misperception of the vast majority of honest, conscientious, and ethical lawyers will ever be corrected is if individual judges and lawyers are willing to overcome a natural resistance to being perceived as troublemakers and vigorously fulfill their sworn duty to refer to disciplinary counsel lawyers who evidence patterns of improper and oppressive litigation tactics. Indeed, such reporting is a basic premise of the entire disciplinary machinery of the Bar.[1] And the Bar,

---

10. Malouf's apparent improper acts include filing pleadings unauthorized by the Utah Rules of Civil Procedure, filing numerous pleadings and motions that continued to argue matters previously settled by court rulings, apparent disobedience to court orders prohibiting certain discovery, and filing a document in response to a request for admissions and interrogatories which claimed that MEI had lied to the court and then proceeded to list, one through ten, the alleged lies.

What is perhaps most troubling is that disobedience to court orders and oppressive litigation tactics that waste court resources and require opponents to spend a great deal of money in defense thereof appear to be characteristic of Malouf's practice. On two previous occasions, this court has upheld sanctions against him. In *Utah Farm Production Credit Association v. Labrum,* 762 P.2d 1070 (Utah 1988), we upheld a contempt sanction against Malouf for direct disobedience to a court order. In *Barber v. Emporium Partnership,* 800 P.2d 795 (Utah 1990), we stated:

> As the trial judge concluded, Malouf has "persist[ed] in pursuing and seeking remedies after all relevant legal issues have been settled," resulting in the Barbers' being "burdened by the expense of legal fees to answer matters that have previously been adjudicated." This litigation has continued since 1979 over a promissory note executed for a value which hardly justifies the time and money the parties and their attorneys have spent in handling the case or the court time it has required. The $3,000 sanction against Malouf is affirmed.

*Id.* at 798. We strongly denounce this pattern of misconduct.

1. Rule 8.3(a) of the Utah Rules of Professional Conduct provides, "A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority." Canon 3(D) of the Code of Judicial Administration adds, "A judge should take or

acting under this court's supervision, does vigorously pursue discipline of its members when this conduct comes to its attention.

Today, by referring Mr. Malouf to Bar Disciplinary Counsel, I am fulfilling my obligation and reaffirming that we lawyers take seriously the need to police our profession.

DURHAM and RUSSON, JJ., concur in Chief Justice ZIMMERMAN's concurring opinion.

initiate appropriate disciplinary measures against a judge or lawyer for unprofessional con-

duct of which the judge may become aware."