**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 27, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

QEP ENERGY COMPANY,
a Texas Corporation,

       Plaintiff-Counter-
       Claim-Defendant-
       Appellee,

v.

CHRISTOPHER M. SULLIVAN,

       Defendant-Counter-
       Claim-Plaintiff-
       Appellant.

No. 11-4012
(D.C. No. 2:08-CV-00859-TC)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**EBEL**, Circuit Judge.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In this appeal we are asked to construe a contract assigning an oil and gas lease. More specifically, the dispute centers on the nature of the interest reserved by the assignor. The district court ruled in favor of QEP Energy Company (QEP) on the contract-interpretation question. After a bench trial, the court entered judgment against Christopher M. Sullivan. Mr. Sullivan now appeals pro se the district court's judgment. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I.**

In 1970 the Bureau of Land Management (BLM) issued a federal oil and gas lease to Joseph A. Thomas on 2,556.61 acres of land located in Uintah County, Utah. The lease, which was assigned the identifying number U-11001, had a primary 10-year term, but would continue as long as oil and gas was produced in paying quantities. Lease U-11001 was subject to a 12½ percent royalty on the mineral production removed or sold from the leased lands, payable to the federal government as lessor.

BLM regulations require all assignments of record title to be executed on an official BLM form or an exact copy of the official form. On February 2, 1972, Mr. Thomas assigned all of his record title in lease U-11001 to Raymond Chorney, using a copy of the official BLM assignment form (hereafter Thomas Assignment). The BLM form asked a series of questions and provided spaces for filling in the parties' responses. It also included printed instructions for

-2-

completing and filing the form with the BLM.  Section 5 of the Thomas

Assignment states as follows, with the parties' typewritten insertions on the BLM

form shown in bold:

> 5a.  What overriding royalty or production payments is the assignor reserving herein?  (*See Item 4 of General Instructions; specify percentage.*)  **Three Percent (3%) of 8/8, see attached rider**.
>   b.  What overriding royalties or production payments, if any, were previously reserved? *(Percentage only)*  **NONE**

R., Vol. 3 at 95.  Item 4 of the General Instructions provided:

> *Overriding royalties or payments out of production* – Describe, in an accompanying statement, any overriding royalties or payments out of production created by assignment but not set out therein.  If payments out of production are reserved by assignor, outline in detail the amount, method of payment, and other pertinent terms.

*Id.* at 96.  The "attached rider" referenced by the parties in the Thomas

Assignment was another pre-printed form, which provided, in relevant part, as

follows (again, with the parties' typewritten insertions shown in bold):

> Assignor hereby excepts and reserves an obligation equal to $ **300.00** per acre for the number of acres assigned hereby, the same to be paid out of **3%** of the market value at the wells, as produced, of all the oil and gas which may be produced, saved and marketed from the above described lands under the terms of said lease or any extensions or renewals thereof.  All payments made on account of said obligation shall be computed and paid at the same time and in the same manner as royalties payable to the Lessor under the terms of said lease are computed and paid. . . .

*Id.* at 97.

In October 1974 a portion of lease U-11001 was committed to a unit plan of development,[1] which resulted in segregation of the lease. *See id.*, Vol. 4 at 116; *see also* 43 C.F.R. § 3107.3-2 (providing for segregation of leases, with "one covering the lands committed to the plan, the other lands not committed to the plan"). The acres of land committed to the unit agreement retained lease number U-11001, and that lease expired in 1987. The remaining acres were assigned lease number UTU-28652, and that lease remains active.

In late 1998 or early 1999, Mr. Sullivan learned through a business acquaintance, Robert Weaver, that revenue payable to Mr. Thomas from his reserved interest in lease U-11001 was about to be abandoned to the State of Utah as escheat property. Mr. Weaver and Mr. Sullivan decided to try to acquire Mr. Thomas's interest, and Mr. Sullivan located Mr. Thomas's widow, Martha P. Thomas. On May 13, 1999, Ms. Thomas assigned all of her interest in lease U-11001, including any segregated portions thereof, to a middleman, Dennis Oliver. Mr. Oliver then assigned his interest to Mr. Sullivan and to Mr. Weaver's company, B&A Properties, LLC. That assignment provided, in relevant part:

---

[1] "Unitization refers to the consolidation of mineral or leasehold interests in oil or gas covering a common source of supply." *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1410 (10th Cir. 1990); *see also* Lewis C. Cox, Jr. & Gregory J. Nibert, Law of Federal Oil & Gas Leases § 18.01[2] (Matthew Bender & Co. 2011) ("Unitization is the agreement to jointly operate an entire producing reservoir or a prospectively productive area of oil and/or gas. The entire unit area is operated as a single entity, without regard to lease boundaries, and allows for the maximum recovery of production from the reservoir.").

Dennis Oliver . . . does hereby, assign, transfer and quit claim that certain 3.0% Overriding Royalty interest previously reserved by Joseph A. Thomas on 2-2-72, to:

> B&A Properties, LLC . . . (an undivided ½ or 1.50%); and

> Christopher M. Sullivan . . . (an undivided ½ or 1.50%);

. . . to include all of Assignor's right, title and interest in and to U.S.A. Lease U-11001, and any extensions, renewals, or segregated portions thereof, including Lease UTU-28652 . . . .

R., Vol. 4 at 120 (emphasis and all caps omitted).

Mr. Sullivan initially received disbursement of half of the funds that had been scheduled for abandonment to the state. The then-current operators of the wells on lease UTU-28652 made regular payments to Mr. Sullivan for several years. QEP later acquired its interest in lease UTU-28652 and began making payments to Mr. Sullivan as well. In early 2006 QEP determined that the total payments to Mr. Sullivan by all operators exceeded his interest in the leases, as construed by QEP. QEP therefore ceased further payments and sought reimbursement of the overpayment from Mr. Sullivan. He disputed the claim, asserting that QEP owed him additional payments.

QEP brought this action in Utah state court, seeking a declaration that the Thomas Assignment reserved a three percent production-payment interest capped at $300 per acre on the U-11001 lease. QEP alleged that the total amount of the production payment was $766,983.00 ($300 x 2,556.61 acres). It also sought recovery from Mr. Sullivan of an alleged overpayment of $86,351.12.

-5-

Mr. Sullivan removed the case to federal district court and filed a counterclaim for declaratory relief. He alleged that the Thomas Assignment reserved both the $300-per-acre obligation and a separate three percent overriding-royalty interest. He brought additional claims seeking the balance of the payments that he alleged remained due to him from QEP.

Both parties filed motions for partial summary judgment on their claims for declaratory relief. The district court held that the Thomas Assignment unambiguously describes only a three percent production-payment interest and therefore granted partial summary judgment in favor of QEP. After a bench trial on the remaining claims, the district court found that QEP established it had overpaid Mr. Sullivan and was entitled to repayment under a theory of unjust enrichment. The court entered judgment awarding QEP $86,351.12 in damages, plus prejudgment and postjudgment interest and costs. It dismissed Mr. Sullivan's counterclaims with prejudice. He filed a timely appeal in which he challenges the district court's grant of partial summary judgment to QEP. He contends that the court misconstrued the Thomas Assignment, requiring reversal of the final judgment in favor of QEP.[2]

---

[2]     Other than as they relate to construction of the Thomas Assignment, Mr. Sullivan does not raise any claim of error with respect to the district court's findings of fact or conclusions of law following the bench trial.

**II.**

We review a district court's grant of summary judgment de novo. *Trans-Western Petroleum, Inc. v. U.S. Gypsum Co.*, 584 F.3d 988, 992 (10th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court's interpretation of the Thomas Assignment is likewise subject to de novo review. *See Allison v. Bank One-Denver*, 289 F.3d 1223, 1244 (10th Cir. 2002).[3]

**A.**

The parties agree that Utah substantive law applies in this diversity case. "Utah courts apply the general principles governing the interpretation of contracts to documents conveying mineral interests." *Trans-Western Petroleum*, 584 F.3d at 993. Our first task is to determine whether the Thomas Assignment is ambiguous with respect to the interest or interests reserved by Mr. Thomas.

> If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law.
>
> A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.

---

[3] Although we ordinarily liberally construe a pro se party's filings, that rule does not apply when, as here, the appellant is also an attorney. *See Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir. 2007).

*Id.* (citation omitted).  Both Mr. Sullivan and QEP contend that the language of the Thomas Assignment is unambiguous, but they advance conflicting constructions.  The fact of their differing positions does not mean that the contract is necessarily ambiguous.  *See Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) ("To demonstrate ambiguity, the contrary positions of the parties must each be tenable."); *Trans-Western Petroleum*, 584 F.3d at 993 ("[A] finding of ambiguity is justified only if the language of the contract reasonably supports the competing interpretations.").[4]

**1.**

The pertinent language—"Three Percent (3%) of 8/8, see attached rider."—was inserted by the parties to the Thomas Assignment in section 5a on the BLM form.  QEP and Mr. Sullivan concur that the referenced rider describes a production-payment interest entitling Mr. Thomas to receive payments capped at $300.00 per acre.  They also agree that the production payment would be paid out over time from three percent of the production, as defined in the rider.  Their dispute centers on whether "Three Percent (3%) of 8/8, see attached rider" reserved only the production-payment interest described in the rider, as QEP

---

[4]    Utah courts will consider "extrinsic evidence offered to demonstrate that there is in fact an ambiguity." *Trans-Western Petroleum*, 584 F.3d at 993. Neither QEP nor Mr. Sullivan argues that extrinsic evidence establishes that the Thomas Assignment is facially ambiguous.

contends; or two, separate interests, as Mr. Sullivan contends, namely a three percent overriding royalty *and* the undisputed production-payment interest.

**2.**

Despite Mr. Sullivan's contentions otherwise, there is no dispute here regarding the similarities and differences between an overriding royalty and a production payment.[5] Both are nonoperating interests in an oil and gas lease, "that is, an interest which is entitled to receive some percentage of the production or income attributable to the lessee's estate but is not obligated to bear any of the development (*e.g.,* drilling) or operation (*e.g.,* lifting) costs associated therewith." Frank W.R. Hubert, Jr. & James A. Taylor, Oil & Gas § 14.01 (Rocky Mountain Mineral Law Inst. 1985); *see also* Aplt. Opening Br. at 35 (acknowledging overriding royalties and production payments are "separate and distinct interests, paid from a non-operating share of lease production"). An overriding royalty is most commonly understood as "an interest in oil and gas produced at the surface, free of the expense of production, and carved from the working interest held under an oil and gas lease." Hubert & Taylor, § 14.02[1] (quotation omitted). An overriding royalty continues for the entire duration of a lease. *Id.*

---

[5] Mr. Sullivan asserts that, contrary to QEP's contention, overriding royalties and production payments are not synonymous. But QEP did not advance that argument, nor did the district court adopt that position.

Similarly, a production payment (sometimes called an oil payment), "refer[s] to an interest created out of the lessee's estate which is a share of the minerals produced from described premises, free of the costs of production at the surface." *Id.* But a production payment terminates when the lease expires, or sooner if the owner of the interest has received the agreed quantum of production or dollar amount from the sale of production. *See id.*; *see also Sullivan v. Utah Bd. of Oil, Gas & Mining*, 189 P.3d 63, 65 n.2 (Utah 2008) ("An overriding royalty is an interest running throughout the term of the lease, while a production payment is an interest running only until it has yielded a specified sum of money." (quotation, ellipsis & brackets omitted)); Williams & Meyers, Oil & Gas Law § 422.3 (Matthew Bender & Co. 2011) ("An oil payment differs from an overriding royalty in that its duration is limited to the time required for the stated number of units of production or the sum specified in the instrument creating the oil payment to be realized; an overriding royalty, on the other hand, normally has the same duration as the working interest out of which it was created. In most other respects, however, an oil payment and an overriding royalty have substantially identical characteristics.").

**B.**

Although the terms "overriding royalty" or "production payment" are not found in the Thomas Assignment, QEP and Mr. Sullivan agree that other words can be used to reserve these types of interests. Regarding the language at issue

here—"Three Percent (3%) of 8/8, see attached rider."—QEP and Mr. Sullivan concur that the term "8/8," as used in the oil and gas industry, refers to 100 percent of the production from a well. As QEP explains, the BLM's standard landowner royalty is 12½ percent, which is equal to 1/8 of the production. Thus, stating a reserved interest as a percentage of 8/8 confirms that payment will be made from 100 percent of production, rather than from only 7/8 of the production net of the BLM's 1/8 royalty.

Mr. Sullivan argues that "3% of 8/8" is common industry terminology used to reserve an overriding royalty. He contends that, standing alone, "Three Percent (3%) of 8/8" specifies an overriding royalty to be paid out of three percent of 100 percent of gross production from the wells. QEP does not challenge these contentions. But as QEP points out, the language Mr. Sullivan emphasizes does not stand alone in the Thomas Assignment. First, this language is followed by a comma and the words "see attached rider." Second, the language was inserted on the BLM form in response to the question, "What overriding royalty or production payments is the assignor reserving herein?," and the additional instruction, "*specify percentage*." R., Vol. 3 at 95.[6]

---

[6] QEP does contest Mr. Sullivan's further assertion that "8/8" is used exclusively to define the extent of production from which an overriding royalty will be paid out and never to define that same term with respect to a production payment. Whether a contractual term has a specialized meaning in the relevant industry is a question of fact. *See R&R Energies v. Mother Earth Indus., Inc.*,

(continued...)

**1.**

The district court concluded that the words "see attached rider," which were separated from "Three Percent (3%) of 8/8" by a comma, related back to the preceding text, such that the rider provided a more-detailed description of the terms of the stated three percent interest. The court therefore rejected Mr. Sullivan's contention that the operative language reserved two interests. Mr. Sullivan argues on appeal that the words before and after the comma form two separate, independent clauses, and he maintains that the district court's holding ignores a long-standing rule of grammar used to identify independent clauses in a sentence. He contends that the first clause, "Three Percent (3%) of 8/8," stands alone to describe in clear industry terms the reservation of an

---

[6](...continued)
936 P.2d 1068, 1074 (Utah 1997). While Mr. Sullivan repeats his contention regarding this specialized meaning of "8/8" numerous times in his briefs, he fails to cite to evidence in the record supporting it, as required by Fed. R. App. P. 28(a)(9)(A) (providing appellant's argument "must contain . . . appellant's contentions and the reasons for them, *with citations to the authorities and parts of the record on which the appellant relies*" (emphasis added)); *see also Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010) ("Unsupported conclusory allegations do not create a genuine issue of fact." (quotation omitted)). We therefore decline to consider Mr. Sullivan's argument. *See Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir. 2008) (refusing to consider argument where appellant provided no citation within voluminous record to support factual claim). Were we to consider his contention, however, we note that at least one commentator has emphasized the importance of specifying the fraction of production from which a production payment will be made. *See* Williams & Meyers, § 422.4(d) ("[I]t is important to specify clearly whether the payment is to be made from a fraction of 8/8ths of the production or a fraction of a fraction of production . . . .").

-12-

overriding royalty, while the second clause, "see attached rider," stands alone to reference and incorporate the rider, which describes and creates an unrelated production-payment interest. But Mr. Sullivan's construction requires the court to ignore, rather than apply, the grammar rule he cites. *See* William Strunk Jr. & E.B White, The Elements of Style 5 (50th ed. 2009) (instructing "[d]o not join independent clauses with a comma" (emphasis omitted)); *see also* William A. Sabin, The Gregg Reference Manual § 1088 (10th ed. 2005) (noting the error in separating two independent clauses solely by a comma).

**2.**

QEP's construction of the Thomas Assignment does not rest entirely on the parties' use of a comma. QEP also notes that the operative language was added in response to a question on the standard BLM form: "What overriding royalty or production payments is the assignor reserving herein?" R., Vol. 3 at 95.[7] In responding to this question, the form referred the parties to Item 4 of the General Instructions and further instructed them to "*specify percentage*." *Id.* The form also required the parties to disclose the percentage of overriding royalties or production payments, if any, that were previously reserved.

---

[7] Despite the BLM form's use of the term "or," neither Mr. Sullivan nor QEP contends that the parties could only create an overriding royalty or production payments, but not both, in the Thomas Assignment.

-13-

QEP points to a then-current regulation to explain why the BLM form sought disclosure of the percentage of these types of interests, both new and previously reserved. At the time the Thomas Assignment was executed, a regulation precluded agreements creating overriding royalties or production payments which aggregated in excess of 17½ percent, when added to the royalty payable to the United States and to previously reserved overriding royalties or production payments. *See* R., Vol. 3 at 83 (text of 43 C.F.R. § 3103.3-6 (1972)).[8] Thus, to the extent they aggregated more than five percent, overriding royalties or production payments would be considered "excess" when added to the United States' standard 12½ percent royalty. But such excess reservations did not violate the terms of a lease if the agreement provided that the obligation to pay them would be suspended when average production fell below a minimum amount. *See id.*

---

[8] The then-current regulation provided:

> An agreement creating overriding royalties or payments out of production of oil which, when added to overriding royalties or payments out of production of oil previously created and to the royalty payable to the United States, aggregate in excess of 17½ percent shall be deemed a violation of the terms of the lease unless such agreement expressly provides that the obligation to pay such excess overriding royalty or payments out of production of oil shall be suspended when the average production of oil per well per day averaged on the monthly basis is 15 barrels or less.

R., Vol. 3 at 83 (text of 43 C.F.R. § 3103.3-6 (1972)). As indicated by the text, this provision applied only to oil production. *See id.*

We assume that the parties to the Thomas Agreement contracted with knowledge of the existing regulatory scheme. *See Wash. Nat'l Ins. Co. v. Sherwood Assoc.*, 795 P.2d 665, 669 n.7 (Utah App. 1990). Thus, consistent with the then-current regulation, we construe the instruction to "specify percentage" in section 5a of the BLM form as requiring the parties to specify the total percentage of the two stated types of interests being reserved in the assignment, whether they be overriding royalties or payments out of production. *See id.* at 669 ("[C]ontracts embrace laws which affect their validity, construction, discharge, and enforcement.")[9]

**3.**

Under Mr. Sullivan's construction of the Thomas Assignment, Mr. Thomas reserved a three percent overriding royalty and a three percent production payment, for a total new reserved-interest percentage of six percent. Yet the parties specified only three percent in section 5a. Mr. Sullivan attempts to explain this discrepancy by pointing to the language of Item 4 of the General Instructions, which directed the parties to "[d]escribe in an accompanying statement, any overriding royalties or payments out of production created by

---

[9] QEP points to the lack of an express provision regarding the suspension of excess royalties in the Thomas Assignment, as further evidence that the parties did not reserve interests aggregating greater than five percent. Mr. Sullivan responds that the Thomas Assignment does contain the required suspension provision. We need not resolve that dispute in order to construe the operative language in the Thomas Assignment.

assignment *but not set out therein.*" R., Vol. 3 at 96 (emphasis added). He notes

that a production-payment interest could not feasibly be described in full in the

small space provided on the BLM form. Therefore, he contends the General

Instructions permitted the parties to "set out" the terms of a production-payment

interest entirely in a separate statement rather than on the assignment form

itself—and that is what the parties to the Thomas Assignment did in this case.

We are not persuaded. We must "consider each contract provision in

relation to all of the others, with a view toward giving effect to all and ignoring

none." *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 207 P.3d 1235, 1240

(Utah 2009) (quotation & ellipsis omitted). "Seeming contradictions must be

harmonized if that course is reasonably possible." *Vitagraph, Inc. v. Am. Theatre

Co.*, 291 P. 303, 306 (Utah 1930). Thus, "[a] construction which entirely

neutralizes one provision should not be adopted if the contract is susceptible of

another which gives effect to all of its provisions." *Id.*

Mr. Sullivan's construction of Item 4 of the General Instructions as

permitting the parties to describe a production payment being reserved, including

the percentage of production from which it would be paid, solely in a separate

statement, contradicts section 5a. That section asked what overriding royalty or

production payments were being reserved in the assignment and explicitly

directed the parties to specify the percentage. Because we must give effect to

both of these instructions in the BLM form, Mr. Sullivan's interpretation is not

tenable.  Thus, we construe Item 4 of the General Instructions as directing the parties to set out in a separate statement any terms of an overriding royalty or production payment reserved in the assignment *other* than the percentage of the interest that the parties were explicitly directed to specify in section 5a.  The parties to the Thomas assignment did just that by stating "Three Percent (3%) of 8/8," in section 5a, followed by a reference to the rider, which described the additional terms of the three percent production payment, as required by Item 4 of the General Instructions.  *See* R., Vol. 3 at 96 (directing parties reserving payments out of production to "outline in detail the amount, method of payment, and other pertinent terms").

### III.

Read as a whole, we find no ambiguity in the language of the Thomas Assignment with respect to the interest reserved by Mr. Thomas.  The language does not reasonably support Mr. Sullivan's interpretation that Mr. Thomas reserved both a three percent overriding royalty and the three percent production payment described in the rider.  *See Trans-Western Petroleum*, 584 F.3d at 993 ("[A] finding of ambiguity is justified only if the language of the contract reasonably supports the competing interpretations.").  We hold that the parties' insertion of the words "Three Percent (3%) of 8/8, see attached rider" in

section 5a of the BLM form created the three percent production-payment

interest, the terms of which were further defined in the referenced rider.

The judgment of the district court is AFFIRMED.

Entered for the Court

Wade Brorby
Senior Circuit Judge